No. 94-602

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

SHANNON L. WADSWORTH,

      Plaintiff and Respondent,

  v.

STATE OF MONTANA AND ITS
DEPARTMENT OF REVENUE,

      Defendant and Appellant.

FILED

FEB 2 6 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Eighth Judicial District,
              In and for the County of Cascade,
              The Honorable Thomas McKittrick, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Dennis McCafferty, James, Gray & McCafferty,
          Great Falls, Montana (argued)

      For Respondent:

          Kenneth R. Olson, Attorney at Law,
          Great Falls, Montana (argued)

                      Heard:  October 17, 1995
              Submitted:  October 17, 1995

                Decided:  February 26, 1996

Filed:

_____
         Clerk

Justice James C. Nelson delivered the Opinion of the Court.

The State of Montana (State) and its Department of Revenue (DOR) appeal from the final judgment entered by the Montana Eighth Judicial District Court, Cascade County, following a jury trial finding that Shannon Wadsworth (Wadsworth) was wrongfully terminated from his employment with DOR; finding said wrongful termination was the proximate cause of the damages suffered by Wadsworth; and awarding Wadsworth $85,000 in damages. We affirm.

ISSUES

The following are issues on appeal:

1. Did the District Court err in not granting the State's motion for summary judgment based on Wadsworth's failure to appeal his petition for judicial review?

2. Does Wadsworth have a fundamental constitutional right to the opportunity to pursue employment and, if so, did the State provide a compelling interest for infringing upon that right?

3. Did the District Court err in allowing irrelevant and prejudicial evidence of treatment which Wadsworth claimed he received prior to the termination of his employment?

4. Did the District Court err in allowing irrelevant and prejudicial evidence of treatment which other DOR employees claimed they received from DOR?

5. Did the District Court err in allowing improper opinion, speculation, and legal conclusion testimony?

BACKGROUND

Wadsworth began working as a real estate appraiser for DOR in 1974. On September 14, 1981, DOR enacted conflict-of-interest rule 81-2 precluding DOR appraisers from engaging in independent fee appraisals, real estate sales, or brokerage activities during their off-duty hours. Conflict-of-interest rule 81-2 provides:

2

The very nature of this Division's work requires that our employees attain a high level of credibility and objectivity as viewed by the taxpaying public. When situations arise, such as conflicts of interest, that jeopardize either requirement, the integrity of the Department as well as the respective appraisal and assessor offices is detrimentally affected. Examples of conflicts of interest include, but are not limited to, fee appraising, selling real estate (excluding the sale of one's personal residence or property), and operating or working for a real estate firm.

In such undertakings, the actual risk of and/or appearance of impropriety that occurs cannot be tolerated. Engaging in such activities will bring about immediate disciplinary action and may result in termination.

In December of 1981, Wadsworth received a letter informing him of the conflict-of-interest rule. He filed a grievance claiming that the rule is discriminatory, unfair, and unconstitutional.

The DOR Grievance Committee concluded that the rule was "unreasonable and unnecessary." However, on July 27, 1982, the Director of DOR, Ellen Feaver, rejected the Grievance Committee's recommendation and found the policy statement to be rational and reasonable and thus sustained the rule's application. Wadsworth petitioned the District Court of the Eighth Judicial District, Cascade County, to review Ellen Feaver's decision and requested the court enter an order stating that DOR's policy statement in rule 81-2 is unnecessary, unreasonable, and an arbitrary exercise of police power by DOR.

On October 20, 1986, the District Court ordered a new grievance hearing to be held because the tapes from the initial hearing were missing. DOR subsequently held another grievance hearing and submitted its recommendation to uphold the policy

3

statement. The Director of DOR, Jon LaFaver, adopted the Grievance Committee's recommendation as DOR's final decision.

In its final decision, DOR denied Wadsworth's grievance and gave Wadsworth 30 days to divest himself of all interests in fee appraising, selling real estate, or operating or working for a real estate firm, and that engaging in such activities would result in disciplinary action and possible termination. The State then moved to dismiss Wadsworth's petition for judicial review for lack of subject matter jurisdiction. The District Court granted the State's motion and dismissed Wadsworth's petition for judicial review. Wadsworth did not appeal from this order.

In March of 1989, DOR directed Wadsworth to comply with the conflict-of-interest rule within 30 days. Wadsworth commenced a new grievance with DOR complaining of disciplinary action directed at him for violating the conflict-of-interest rule. The hearing examiner found that Wadsworth had to divest himself of his private fee appraisal business or face discharge. In a letter dated November 27, 1989, the Director of DOR adopted a final decision wherein he accepted the decision of the hearing officer, confirmed the policy statement in rule 81-2, sustained Wadsworth's 9-day suspension without pay, and indicated that Wadsworth had 30 days to divest himself of his interests in fee appraising and selling real estate. On February 16, 1990, DOR terminated Wadsworth from his employment for refusing to give up his outside employment activities.

In November of 1990, Wadsworth filed a wrongful discharge suit in the District Court of the Eighth Judicial District, Cascade county . The State moved for summary judgment arguing that as a matter of law, Wadsworth's termination was not wrongful and Wadsworth's contention that DOR's conflict-of-interest rule is contrary to the United States and Montana Constitutions was barred by his failure to appeal the dismissal of his petition for judicial review. The District Court denied the State's motion for summary judgment. The State then filed a motion in limine seeking to exclude evidence regarding DOR's treatment of Wadsworth prior to his termination. The District Court again denied the State's motion and the case proceeded to trial. The State moved to dismiss Wadsworth's wrongful termination claim as a matter of law at the close of Wadsworth's case and renewed the motion at the close of the evidence. The District Court denied the State's motions and submitted the case to the jury.

In submitting the case to the jury, the District Judge included instructions on fundamental rights and that fundamental rights may not be infringed by the State without a showing of a compelling state interest. The jury rendered a verdict in Wadsworth's favor awarding him $85,000 in damages. DOR appeals the final judgment rendered following the jury trial.

DISCUSSION

1. Did the District Court err in not granting the State's motion for summary judgment based on Wadsworth's failure to appeal his petition for judicial review?

5

The State argues that the District court erred in not dismissing as a matter of law, Wadsworth's claim that his employment was wrongfully terminated. The State claims that Wadsworth raised his constitutional arguments when he challenged the application of the conflict-of-interest rule in his petition for judicial review and therefore the doctrine of res judicata bars him from raising them again in this matter. Conversely, Wadsworth argues that he brought the instant case under the Wrongful Discharge from Employment Act (WDFEA) and thus raises a different subject matter and different issues from those in his petition for judicial review. We review a district court's ruling on a motion for summary judgment de novo. Mead v. M.S.B., Inc. (1994), 264 Mont. **465, 470, 872** P.2d 782, 705.

The State relies on our decision in Matter of Estate of Pegg (1984), 209 Mont. 71, 680 P.2d 316, as the sole authority for its argument. In <u>Estate of Pesg</u>, Walter Pegg was killed in a helicopter crash and died intestate. Pegg's third wife, Virginia, sought appointment as the personal representative of his estate. Pegg's ex-wives filed petitions requesting that Virginia be removed as personal representative of Pegg's estate. The District Court concluded that there was no evidence to support **removal** of Virginia as personal representative and denied the petitions. The ex-wives again filed a petition for removal of Virginia as personal representative asserting new grounds for the removal. <u>Estate of Pegg</u>, **680** P.2d at 317-318. The district court orally denied these petitions. We held that the district court's first order refusing

to revoke Virginia's status as administrator of Pegg's estate was final and therefore appealable. The second petitions merely raised new grounds for removal and "had all the appearances of unjustified delaying tactic." Therefore, we did not reach the merits of the arguments in support of removing Virginia as personal representative. Estate of Pegg, 680 P.2d at 320.

In the recent case, City of Bozeman v. AIU Ins. Company (1995), 900 P.2d 929, 52 St.Rep. 823, we discussed the doctrine of res judicata more thoroughly. The doctrine of res judicata includes the following four elements:

> (1) the subject matter of each action must be the same;
> (2) the parties or their privies of each action must be the same;
> (3) the issues must be the same and relate to the same subject matter;
> (4) the capacities of the persons must be the same and relate to the same subject matter and the issues between them.

City of Bozeman, 900 P.2d at 932 (citing State ex rel. Harlem Irr. Dist. v. Judicial Dist. Court (1995), 271Mont. 129, 894 P.2d 943.)

Wadsworth's present action does not meet the four criteria set forth in City of Bozeman. Wadsworth's WDFEA claim involves a different subject matter from his petition for judicial review, different issues from his petition for judicial review, and the capacities of the parties had changed in relation to the subject matter and the issues between them. Initially, Wadsworth and two other DOR employees sought judicial review of the Director of DOR's decision to reverse a three-person panel's conclusion that the conflict-of-interest policy was unreasonable and sought review of her subsequent decision to re-implement the policy. In the instant

7

case, after his termination, Wadsworth brought a WDFEA claim against the State. Although it involves the same parties and some of the same issues, it is a distinct and separate proceeding not subject to res judicata.

Wadsworth's WDFEA claim is also distinguishable from Estate of Pegg in that it did not involve an unjustified delaying action nor was it a second action requesting the same relief relying on new grounds. Accordingly, as a matter of law, the District Court correctly denied the State's motion for summary judgment.

2. Whether Wadsworth has a fundamental constitutional right to the opportunity to pursue employment and, if so, whether the State provided a compelling interest for infringing upon that right?

The State argues that the District Court incorrectly referred questions of law to the jury to determine. The State further argues that there are no questions of fact implicit in the analysis of whether the conflict-of-interest rule unconstitutionally infringed upon the right asserted by Wadsworth, only a question of law for the judge to determine.

Sections 26-1-201 and 26-1-202, MCA, delineate the province of the court and the jury. These sections provide as follows:

> 26-1-201. Questions of law. Except as provided in Article II, section 7, of the Montana constitution, all questions of law, including the admissibility of testimony, the facts preliminary to such admission, the construction of statutes and other writings, and other rules of evidence, must be decided by the court.

> 26-1-202. Questions of fact. If a trial is by jury, all questions of fact other than those mentioned in 26-1-201 must be decided by the jury, and all evidence thereon must be addressed to them, except as otherwise provided by law. If the trial of a question of fact is not by

8

> jury, all evidence thereon must be addressed to the trial court, which shall decide such question.

Sections 25-7-102 and 25-7-103, MCA, similarly set forth issues of law to be decided by courts and issues of fact to be decided by juries. Section 26-1-201, MCA, states that it is the province of the court to construe statutes and other writings. Montana's constitution clearly constitutes an "other writing," the interpretation of which is appropriately within the province of the judge not the jury.

For example, in State v. Poncelet (1980), 187 Mont. 528, 610 P.2d 698, we upheld a trial court's ruling not to allow a witness to testify about the constitutionality of a law because

> [t]he interpretation and application of the United States Constitution was a question of law and not a fact in issue. It was a determination to be made by the trial judge within his statutory powers.

Similarly, we have held a defendant's attack on the constitutionality of Montana's compulsory automobile liability insurance statutes presented only questions of law. State v. Turk (1982), 197 Mont. 311, 317, 643 P.2d 224, 228. A determination of the constitutionality of the statutes required an analysis of what rights were involved and the corresponding level of scrutiny to apply to the liability insurance statutes. Because the liability insurance statutes burdened a constitutional right but not a fundamental constitutional right, the State only had to show that the statutes were rationally related to a legitimate governmental objective. Turk, 643 P.2d at 227. We held that this analysis exclusively presented questions of law for the judge's

9

determination.  Turk, 643 P.2d at 228; see also People v. Zinn (Co. 19931, 843 P.2d 1351, 1354 (whether challenged legislation bears a reasonable relationship to **legitimate** government interests is a question of law); State v. Holmes (Wis. 1982), 315 N.W.2d 703, 708 n.7 (constitutional questions are questions of law); Racine Steel Castings v. Hardy (Wis. 1988), 426 N.W.2d 33, 35 (constitutionality of a statute is a question of law); Valdez v. Gunter (10th Cir. 1993), 988 F.2d 91, 93, cert. denied 114 S.Ct. 151, 126 L.Ed.2d 113 (1993) (whether asserted right is a fundamental right is a question of law)

Moreover, in State v. Pastos (1994), 269 Mont. 43, 47, 887 P.2d 199, 202, we recognized that "when the government intrudes upon a fundamental right, any compelling state interest for doing so must be closely tailored to effectuate only that compelling interest."  We concluded that the compelling state interest analysis is a question of law.  Pastos, 887 P.2d at 202. In Pastos, the legal question was whether there was a compelling state interest which justified a routine, administrative inventory search of the personal property on, or in the possession of, the arrestee at the station house following a lawful arrest. Pastos, 887 P.2d at 202.

The Fifth Circuit Court of Appeals has also held that the application of the strict scrutiny test is a question of law. Woodland v. City of Houston (5th Cir. 1991), 940 F.2d 134, 138. In Woodland, the circuit court stated that the question of whether the city police department's interest in pre-employment polygraph

**10**

testing outweighed the applicant's privacy interest was a question of law and should not have been submitted to the jury. Woodland, 940 F.2d at 138; see also Evans v. Romer (Co. 1993), 854 P.2d 1270, cert. denied 114 S.Ct. 419, 126 L.Ed.2d 365 (1993) (holding that the question of whether an existing constitutional right is infringed is strictly a question of law) (citing Lafferty v. Cook (10th Cir. 1991), 949 F.2d 1546, 1550, cert. denied, 504 U.S. 911 (1992)); Thompson v. Keohane (1995), 116 S.Ct. 457, 460 (noting the declaration that "in custody" question is one of law may guide police, unify precedent, and stabilize the law).

In the instant case, Wadsworth claimed that the conflict-of-interest rule unconstitutionally infringed upon his fundamental right to the opportunity to pursue employment. Wadsworth presented a question of law--i.e. whether he had a fundamental constitutional right and whether the State showed a compelling interest for infringing upon that right. Thus, the question before the District Court was a legal issue containing no implicit questions of fact.

Accordingly, we review as a conclusion of law, the District Court's determination of whether the right Wadsworth asserted was a constitutionally protected right, and if constitutionally protected, whether it was a fundamental right, and if it was a fundamental right, whether the State provided a compelling interest for infringing upon it. We review questions of law de novo to determine whether the court's interpretation of the law is correct. Carbon County v. Union Reserve Coal Co., Inc. (1995), 271 Mont.

11

459, 469, 898 P.2d 680, 686; Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

Here, the District Court interpreted the law in its instructions to the jury as follows:

> Instruction number 15: All persons have as an inalienable right the opportunity of pursuing life's basic necessities. The right to terminate an employee is not absolute but subject to exercise in accordance with constitutional provisions.

> Instruction number 9: You are instructed that the right: to pursue life's basic necessities; to acquire, possess and protect property; to individual privacy are fundamental rights. Said rights shall not be infringed by the State without the showing of compelling State interest.

However, the District Court erred in submitting to the jury, questions of law that the court itself should have determined. We hold this to be harmless error, in that, as we shall point out, the jury came to the correct conclusion. Accordingly, we review the jury instructions de novo, as the statements of the law applicable to this case.

Wadsworth asserts that Article II, section 3 of the 1972 Montana Constitution establishes the inalienable right to pursue life's basic necessities which right necessarily includes the opportunity to earn a living, and that DOR wrongfully terminated him because he asserted this constitutionally protected right. Article II of Montana's constitution, entitled Declaration of Rights, enumerates various rights, among which are certain "inalienable rights" set forth at section 3. That section provides:

12

> All persons are born free and have certain inalienable rights. They include the right to a clean and healthful environment and the rights of pursuing life's basic necessities, enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and seeking their safety, health and happiness in all lawful ways. In enjoying these rights, all persons recognize corresponding responsibilities.

While section 3 does not refer to "fundamental rights" per se, nevertheless, we have held a right may be "fundamental" under Montana's constitution if the right is either found in the Declaration of Rights or is a right "without which other constitutionally guaranteed rights would have little meaning." Butte v. Community Union (1986), 219 Mont. 426, 430, 712 P.2d 1309, 1311-13 (holding that Montana's constitution does not create a right to welfare). The inalienable right to pursue life's basic necessities is stated in the Declaration of Rights and is therefore a fundamental right.

While not specifically enumerated in the terms of Article II, section 3 of Montana's constitution, the opportunity to pursue employment is, nonetheless, necessary to enjoy the right to pursue life's basic necessities. See Globe Newspaper Co. v. Superior Court for Norfolk County (1982), 457 U.S. 596, 604, 102 S.Ct. 2613, 2618-19, 73 L.Ed.2d 248, 255 (First Amendment encompasses those rights that, while not specifically enumerated in the very terms of the Amendment, are nonetheless necessary to enjoyment of other First Amendment rights). As a practical matter, employment serves not only to provide income for the most basic of life's necessities, such as food, clothing, and shelter for the worker and the worker's family, but for many, if not most, employment also

13

provides their only means to secure other essentials of modern life, including health and medical insurance, retirement, and day care. We conclude that without the right to the opportunity to pursue employment, the right to pursue life's basic necessities would have little meaning, because it is primarily through work and employment that one exercises and enjoys this latter fundamental constitutional right. Accordingly, we hold that the opportunity to pursue employment, while not specifically enumerated as a fundamental constitutional right under Article II, section 3 of Montana's constitution is, notwithstanding, necessarily encompassed within it and is itself a fundamental right because it is **a** right "without which other constitutionally guaranteed rights would have little meaning." Butte, 712 P.2d at 1311. We also hold that the District Court correctly interpreted the law in its Instructions number 15 and 9.

This interpretation of Montana's constitution is supported by the decisions of other jurisdictions which have held their state constitutions to encompass a fundamental right to the opportunity to pursue employment. For example, the right to pursue any proper vocation under the personal liberty clause of Indiana's state constitution is a fundamental right. Kirtley v. State (Ind. 1949), 84 N.E.2d 712, 714 (holding that a statute regarding the sale of tickets interfered with the liberties and the personal and property rights of a ticket owner). In Kirtley, the Indiana Supreme Court construed Indiana's personal liberty clause to confer not only freedom from servitude and restraint, but also "the right of

14

**everyone** to be free in **the use of their powers in the pursuit of** happiness in such calling as they may choose subject only to the restraints necessary to secure the common welfare."

Similarly, in Florida, "[t]he right to work, earn a living and acquire and possess property from the fruits of one's labor is an inalienable right." Lee v. Delmar (Fla. 1953), 66 So.2d 252, 255. In Lee, the Florida Supreme Court held that a resolution prohibiting a real estate salesperson from operating part-time was invalid as depriving the salesperson of his inalienable right to work and earn a living and as an excess of power granted to the Real Estate Commission. Lee, 66 So.2d at 255. In Town of Milton v. Civil Service Commission (Mass. 1974), 312 N.E.2d 188, 192, citing Truax v. Raich (1915), 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131, 135, the Supreme Court of Massachusetts stated that "[i]t is certainly true that the opportunity to earn a living is a fundamental right in our society." But the court also clarified that "[i]t is an equally basic axiom that there is no right to public employment." Milton, 312 N.E.2d at 192 (discussing durational residency requirements).

Likewise, we distinguish the right to *a particular* job or employment from the right to pursue life's basic necessities through employment. "While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." Boreen v. Christensen (1994), 267 Mont. 405, 410, 884 P.2d 761, 764

15

(quoting Cleveland Board of Education v. Loudermill (1985), 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503). In essence, absent a contract, policy, regulation, or statute providing a specified term of employment, an employee does not have a property interest in a particular job. Boreen, 884 P.2d at 770. The Oregon Supreme Court made this germane distinction in Minielly v. State (Or. 1966), 411 P.2d 69, 73, by stating:

> The conclusion to be drawn . . would appear that while a person does not have a constitutional right to be employed by the public, the government is not free to place unconstitutional prerequisites upon the securing of public employment nor does it have the right to ignore the constitution if it desires to terminate such employment.

Accordingly, while Article II, section 3 of Montana's constitution encompasses the right to the opportunity to pursue employment generally as a necessary incident of the fundamental right to pursue life's basic necessities, that provision of our constitution does not, without more, grant a right or property interest in any *particular* job or employment.

Wadsworth makes no claim to the contrary. Wadsworth does not claim a constitutional right to his state job, but instead claims that by pursuing employment in addition to his job with the State, he has the constitutional right to pursue life's basic necessities, to acquire property, and to be free from the State's interference with his lawful activities. Wadsworth claims that the State has infringed these fundamental rights, not that it deprived him of a right to a specific job.

16

The State argues that because cities or counties may restrict employees' ability to work in outside jobs by placing restrictions on the residency of their employees, DOR may similarly restrict Wadsworth's ability to pursue employment by placing restrictions on the type of outside employment he may pursue. It is true that cities may place police officers in a separate category and impose residence requirements on the officers because the duties and interests protected by police are of a sufficiently distinct character from those of other governmental employees. Brenckle v. Township of Shaler (Pa. 1971), 281 A.2d 920, 922 (a moonlighting case decided on right to travel grounds). However, cases discussing residency requirements have no application to the instant case because they hinge on the right to travel and do not discuss the right to life's basic necessities or the right to the opportunity to pursue employment. See Shapiro v. Thompson (1965), 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; Memorial Hospital v. Maricopa County (1974), 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306; Cole v. Housing Authority of City of Newport (1st Cir. 1970), 435 F.2d 807; Krzewinski v. Kugler (D.N.J. 1972), 338 F.Supp. 492 (compelling state interest existed in requiring police officers to reside in the municipality).

The State also cites a California Court of Appeals case in which an employee challenged a rule limiting the number of hours she could work in outside employment on the basis that the rule constituted an irrebuttable presumption. Baity v. Los Angeles County Civil Service Commission (1980), 162 Cal.Rptr. 812, 813.

17

The court in _Baity_ did not analyze the rule in terms of its infringement upon the opportunity to pursue employment, but, instead, analyzed the rule in terms of an allegedly unlawful irrebuttable presumption. Moreover, the court did not acknowledge that any rights were involved in the opportunity to pursue employment and therefore found the county's ability to restrict employment to be nearly unfettered.

Having concluded that the opportunity to pursue employment is a fundamental right as a necessary incident to the fundamental right to pursue life's basic necessities, we must next determine the level of scrutiny to apply to the infringement of that right. In determining what level of scrutiny to apply to legislation or to a rule in question, we first determine what rights are involved. Eastman v. Atlantic Richfield Co. (1989), 237 Mont. 332, 337, 777 P.2d 862, 865. "The extent to which the Court's scrutiny is heightened depends both on the nature of the interest and the degree to which it is infringed." _Memorial Hosoital,_ 415 U.S. at 254-56 (holding that a classification unconstitutionally penalized persons who exercised their right to interstate migration); Laurence H. Tribe, American Constitutional Law § 16-33, at 1610 (2d ed. 1987). Thus the nature of the individual interest affected dictates which standard of review to apply. Matter of C.H. (1984), 210 Mont. 184, 198, 683 P.2d 931, 938. The most stringent standard, strict scrutiny, is imposed when the action complained of interferes with the exercise of a fundamental right or discriminates against a suspect class. Gulbrandson v. Carey

18

(1995), 901 P.2d 573, 579, 52 St.Rep. 843, 846 (citing Eastman, 772 P.2d at 865). Strict scrutiny of a statute is required only when the classification impermissibly interferes with the exercise of a fundamental right. Arneson v. State, By Dept. of Admin. (1993), 262 Mont. 269, 272, 864 P.2d 1245, 1247.

Strict scrutiny of a legislative act requires the government to show a compelling state interest for its action. Shauiro, 394 U.S. at 634. When the government intrudes upon a fundamental right, any compelling state interest for doing so must be closely tailored to effectuate only that compelling state interest. Pastos, 887 P.2d at 202 (citing Zablocki v. Redhail (1978), 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618). In addition to the necessity that the State show a compelling state interest for invasion of a fundamental right, the State, to sustain the validity of such invasion, must also show that the choice of legislative action is the least onerous path that can be taken to achieve the state objective. Pfost v. State (1985), 219 Mont. 206, 216, 713 P.2d 495, 505.

In Robinson, et al. v. Cahill (N.J. 1973), 303 A.2d 273, 282, New Jersey Supreme Court Chief Justice Weintraub notes that it is difficult to define "fundamental right" and that

> if a right is somehow found to be 'fundamental,' there remains the question as to what State interest is 'compelling' and there, too, we find little, if any, light. Mechanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay consideration of it. Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is

19

arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial.

In the instant case, while DOR's conflict-of-interest policy or rule is at issue rather than a statute, we, nevertheless, apply strict scrutiny analysis since the operation of that rule implicates Wadsworth's fundamental right to the opportunity to pursue employment. The constitutionality of the conflict-of-interest rule itself is not the issue, but rather whether the State has infringed Wadsworth's fundamental right without providing a compelling interest for doing so.

As we have held, employment is a necessary means to pursue life's basic necessities, without which the latter fundamental constitutional right could not be enjoyed. As such, the right to the opportunity to pursue employment is itself a fundamental right and is encompassed within the right to pursue life's basic necessitites as declared under Article II, section 3 of Montana's constitution. Because the opportunity to work and to make a living is **a** fundamental right, it is incumbent upon the state to *demonstrate* a compelling interest before it may constitutionally infringe upon that right. Necessarily, *demonstrating* a compelling interest entails something more than simply saying it is so.

Based on the record established in the trial court, we conclude that, as a matter of law, the State failed to demonstrate a compelling interest for the conflict-of-interest rule restricting Wadsworth's ability to pursue employment opportunities and thus pursue life's basic necessities. Simply because the State alleges

20

a compelling interest, does not obviate the necessity that the State prove the compelling interest by competent evidence.

Here, the State adopted the conflict-of-interest rule for the singular purpose of avoiding the appearance of impropriety of real estate appraisers. The evidence at trial established that there were no complaints about any appearance of impropriety when State appraisers appraised property outside of their DOR employment. Mr. Groepper, the Administrator of the Property Assessment Division, stated that none of the grievants nor anyone else had been or was being accused of any actual wrongdoing. The only semblance of a complaint consisted of a letter that Paul Pistoria wrote DOR stating that Wadsworth handed out his private business card while working for the Department. DOR presented no case in which an appearance of impropriety arose; DOR could not demonstrate that Wadsworth jeopardized the integrity of or detrimentally affected DOR or the appraisal or assessor offices in any way. In fact, no one ever expressed a lack of confidence in the integrity of the Property Tax Division or expressed a belief that outside employment activities undermined public confidence. Even Ellen Feaver, the Director of DOR who rejected the Grievance Committee's recommendation that the conflict-of-interest rule was unreasonable and sustained the rule's application, testified that she was aware of no incident of a DOR appraiser compromising the public trust on account of outside employment activities. She also testified that she had not considered the rule's impact on individual appraisers nor did she consider § 2-15-112(f), MCA, which limits the

21

rulemaking powers of the department heads to "statements concerning only the internal management of the agency and not affecting private rights or procedures available to the public."

Dennis Burr, the DOR Administrator of the Property Tax Division, issued the conflict-of-interest rule but never enforced it. Nick Lazanas, the Director of the Cascade County Appraiser Office also chose not to enforce the rule; he did not believe in it nor did he see a reason for it. Additionally, the State's expert witness, Gaylord Aldinger, a member of the International Order of Assessing Officers, admitted that his organization's code of ethics did not preclude outside employment activities, and that in his state, he was not aware of any abuse of official duties by the activities in question. Moreover, the record is ambivalent as to whether the State considered the relevant constitutional provision before it applied the conflict-of-interest policy.

That is not to say that the State could never demonstrate a compelling interest for the conflict-of-interest rule or for some other rule restricting the outside employment of its employees. In this case, on the record here and as a matter of law, it simply did not.

In this regard we note that Article XIII, section 4 of Montana's constitution requires the legislature to provide a code of ethics prohibiting conflict between public duty and private interest for, among others, state and local employees. We also note that the legislature has, pursuant to that constitutional mandate, enacted standards of conduct for public officers and

22

employees, including a code of ethics, at Title 2, Chapter 2, MCA. Neither DOR nor Wadsworth raise any issue as to the application of either Article XIII, section 4 or those standards of conduct and code of ethics in this appeal. Notwithstanding, in the interest of completeness, we acknowledge both this constitutional provision and its implementing statutes and point out that there was no allegation made or evidence in this case that Wadsworth's conduct was at anytime ever in violation of these statutes.

We hold that, because the State did not demonstrate a compelling interest for applying the conflict-of-interest rule at issue here, the State wrongfully terminated Wadsworth's employment.

In this regard, Wadsworth brought his claim under Montana's WDFEA, asserting that the conflict-of-interest rule violated public policy because it violated his fundamental right to pursue life's basic necessities without a compelling state interest for doing so. In 1987, the Montana Legislature enacted the WDFEA establishing three elements of wrongful discharge. See § 39-2-904, MCA. Section 39-2-904, MCA, states that

> A discharge is wrongful only if:
> (1) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;
> (2) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or
> (3) the employer violated the express provisions of its own written personnel policy.

Moreover, § 39-2-903(7), MCA, defines public policy as "a policy in effect at the time of the discharge concerning the public health,

23

safety, or welfare established by constitutional provision, statute, or administrative rule."

Wadsworth contends that DOR terminated his employment in retaliation for his refusal to abide by a rule that was in contravention of public policy. Wadsworth asserts that the public policy in effect at the time of his discharge was the policy established by constitutional provision guaranteeing each person the right to pursue life's basic necessities by earning a living. We agree.

Public policy is often based on constitutional provisions, especially those which on their face, create inalienable or fundamental rights. See Gantt v. Sentry Ins. (Cal. 1992), 824 P.2d 680, 687; see also Foley v. Interactive Data Corp. (Cal. 1988), 765 P.2d 373. For example, in Gantt the Supreme Court of California noted that public policy "must involve a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer; in addition, the policy must be fundamental, substantial, and well established at the time of discharge." Gantt, 824 P.2d at 684. In discussing the public policy exception to wrongful discharge, the court further noted that:

> A public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees are protected against employer actions

24

that contravene fundamental state policy. And society's interests are served through a more stable job market, in which its most important policies are safeguarded.

Gantt, 824 P.2d at 688.

Article II, section 3 of Montana's constitution explicitly protects the right to pursue life's basic necessities as an inalienable or fundamental right, which, as stated above, includes the right to the opportunity to pursue employment as a necessary incident. Accordingly, Montana's public policy in this regard is set forth in Article II, section 3.

Since we have determined that, on the record here, there was no demonstrated compelling interest for the State's conflict-of-interest rule, it follows that the rule violated the public policy in favor of the right to pursue life's basic necessities protected under Montana's constitution. Accordingly, the State's termination of Wadsworth in retaliation for his refusal to abide by a rule that was in contravention of the constitution violated the WDFEA.

3. Did the District Court err in allowing irrelevant and prejudicial evidence of treatment which Wadsworth claimed he received prior to the termination of his employment?

4. Did the District Court err in allowing irrelevant and prejudicial evidence of treatment which other DOR employees claimed they received from the Department?

5. Did the District Court err in allowing improper opinion, speculation, and legal conclusion testimony?

Because we hold that the State did not provide a compelling interest for its conflict-of-interest rule, and therefore wrongfully terminated Wadsworth in retaliation for his refusal to violate public policy, we need not address issues 3, 4, or 5. In order for this Court to reverse the District Court, the State had

25

to show that the evidence complained of violated its substantial rights. The State was not able to do so because the parties agreed that Wadsworth was terminated for refusing to comply with the conflict-of-interest rule and was not terminated for any reasons pertaining to his treatment on the job prior to his termination. In short, there were no factual disputes as to why Wadsworth was fired. Accordingly, notwithstanding the District Court's alleged error in admitting irrelevant evidence, such error, if any, was harmless because it did not affect the substantial rights of the State. See Abbey v. City of Billings Police Com'n (1994), 268 Mont. 354, 364, 886 P.2d 922, 928.

Moreover, the State made no showing of how the error may have prejudiced the amount of damages the jury awarded. The State could not have made such a showing because the WDFEA constrains the extent to which damages may be awarded to lost wages, fringe benefits, and the interest thereon, for a period not to exceed four years from the date of discharge. Therefore, we conclude that there was no error that affected the substantial rights of the State.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

26

_____

_____

_____
W. William Rehquist
Justices

27

Justice Terry N. Trieweiler specially concurring.

I concur with the majority's resolution of Issues numbered I, 3, 4, and 5. I specially concur with the majority's resolution of Issue 2 because although I agree with the result arrived at in that section of the Court's opinion, I disagree that the District Court erred by submitting underlying factual issues to the jury.

The majority correctly concludes that the opportunity to pursue employment is one of life's basic necessities, and therefore, a fundamental right guaranteed by Article II, Section 3, of the Montana Constitution. I also agree that before the State can interfere with that fundamental right, it must establish a compelling state interest for doing so and that whether a particular interest, if proven, is "compelling" is a question of law. However, where the very facts which form the basis for the State's alleged interest are disputed, the resolution of that dispute involves a question of fact.

For example, in this case, the State alleged that its conflict of interest rule served the interest of avoiding the appearance of impropriety by real estate appraisers. Had that fact been established by competent evidence, the determination of whether that fact established a compelling state interest would have been an issue of law. However Wadsworth, and numerous others who were qualified by training and experience, testified that the conflict of interest rule was unnecessary and bore no relationship to public confidence in real estate appraisers. Therefore, whether there was any relationship between the conflict of interest rule and public

28

confidence raised an issue of fact which must necessarily be decided by the finder of fact--in this case, the jury. As pointed out by the majority, § 26-1-202, MCA, provides as follows:

> If a trial is by jury, all questions of fact other than those mentioned in 26-1-201 must be decided by the jury, and all evidence thereon must be addressed to them, except as otherwise provided by law. If the trial of a question of fact is not by jury, all evidence thereon must be addressed to the trial court, which shall decide such question.

That underlying questions of fact were at issue is evident from the majority's opinion. In analyzing whether proof was offered of a compelling state interest, the majority opinion repeatedly refers to the evidence at trial. Evidence is considered for the sole purpose of resolving factual issues which are the unique responsibility of juries or the district court, as the case may be.

What the majority has, in effect, held is that in every case involving a constitutional issue with an underlying factual component, this Court is in the best position to resolve the factual issue *denovo* on appeal. The majority's position is similar to the position of the majority on the Second Circuit Court of Appeals in *United States v. A Motion Picture Film Entitled "I Am Curious-Yellow"* (2d Cir. 1968), 404 F.2d 196. In that case, a jury, after being instructed on the constitutional standards for judging obscenity, concluded that the motion picture in question was obscene. The Second Circuit Court of Appeals concluded that:

> [I]n our view obscenity *vel non* is not an issue of fact with respect to which the jury's finding has its usual

29

conclusive effect. It is rather an issue of constitu-
tional law that must eventually be decided by the court.

*A Motion Picture Film,* 404 F.2d at 199.

Based on its own review of the motion picture, the majority of
that court concluded that it was not obscene because it did not
satisfy the first two parts of the three-part test set forth by the
U.S. Supreme Court.

In his dissent from the majority's disregard for the jury's
fact-finding function, Chief Judge Lumbard made the following
remarks, which I believe apply to the majority's disregard for the
jury's fact-finding function in this case:

> My colleagues give no satisfactory explanation why
> jurors are not as qualified as they to pass upon such
> questions. The conclusion is inescapable that they
> really think that the issue of obscenity can be entrusted
> to juries only if the judges themselves (or, as here, a
> majority of them) think the matters in question go beyond
> the limits allowed by law. I had not supposed that only
> those who wear federal judicial robes are qualified to
> decide whether a motion picture has any redeeming social
> value.
>
> . . .
>
> But the majority would take away from the jury the
> power to pass on these not too difficult and complicated
> questions by saying that obscenity is "an issue of
> constitutional law" rather than an issue of fact with
> respect to which the jury's finding has its usual
> conclusive effect. To me this simply means that juries
> are not to be trusted where a majority of the judges
> disagree with them.
>
> . . . There is no reason to suspect that judges are
> in any better position to pass judgment on these matters
> than are jurors. .
>
> With due deference to the very considerable
> intellectual attainments of my colleagues, I submit that
> when it comes to a question of what goes beyond the
> permissible in arousing prurient interest in sex, the

30

> verdict of a jury of twelve men and women is a far better
> and more accurate reflection of community standards and
> social value.  The jurors are drawn from all walks of
> life and their less pretentious positions in the
> community qualify them to answer the questions put to
> them by Judge Murphy at least as well as circuit judges
> in their middle sixties who celebrate in the ivory towers
> of the judiciary.

*A Motion Picture Film,* 404 F.2d at 203-04 (Lumbard, J., dissenting)

(footnotes omitted).

Chief Judge Lumbard's dissent was cited at length and adopted by the Supreme Court of Wisconsin in *Court v. State* (1971), 188 N.W.2d 475, where that court struggled with the proper scope of review of a jury verdict that printed material was obscene

After noting Chief Judge Lumbard's dissent, that court held that:

> We agree with Mr. Chief Judge Lumbard's dissent and
> adopt the principle which he espoused. The determination
> of obscenity is a factual matter to be resolved by a
> finder of fact following constitutional guidelines,
> subject to review by an appellant [sic] court which seeks
> to determine merely whether the evidence underpinning the
> verdict was sufficient in view of the record as a whole.

*Court, 188 N.W.2d* at 483.

In *Collier v. Civil Service Commission* (Tex. Ct. App. 1989) , 764 S.W.2d 364, the Texas Court of Appeals was asked to decide whether "nepotism" rules adopted by the Civil Service Commission for the city of Wichita Falls violated the equal protection clause of the Texas Constitution.  The nepotism rule provided that no person could be employed by the fire department if a member of that person's immediate family was already employed by the department. The city contended that the rule was necessary in order to avoid

31

impairment of one firefighter's judgment when placed in a situation where a member of that person's family was in peril

The Texas court held that to decide the constitutional issue raised by the petitioners, several fact issues must first be resolved, including whether the rule advances legitimate government objectives. (A similar rational basis test would be applied by our Court if a fundamental interest was not at issue.) In holding that underlying factual issues must be resolved by the finder of fact before the constitutional issue could be resolved, the Texas court stated as follows:

> Deciding the constitutionality of a statute necessarily involves several related fact questions. See Pine, *[Speculation and Reality: The Role of Facts in Judicial Protection of Fundamental Rights,* 136 U.Pa.L.Rev. 655 (1988)],* 666-67. For example, Wichita Falls argues the nepotism rule will prevent a firefighter's unavoidable impairment of judgment in a situation where a member of his immediate family is involved in a perilous situation. Appellants argue strong emotional bonds exist between firefighters even if they are not related by blood or marriage. These issues are relevant to whether the nepotism rule will advance the governmental objective of improving the safety of the fire department, but this court does not have any special knowledge of emotional ties between firefighters or the dangers found within burning buildings. This question involves social and emotional issues, but it is still a question of fact. Social facts may be developed through expert testimony, "Brandeis briefs" or requests for judicial notice. Pine, *supra* at 662-63. We are unwilling to base our decision on the unsupported generalizations contained in the briefs.
>
> The trial court did not make any specific findings of fact; therefore, we do not consider the standard of review for findings of fact in a case involving constitutional rights. *See generally,* Louis, *Allocating Adjudicative Decision Making Authority Between the Trial and Appellate Levels: A Unified View of the Scope of Review, The Judge/Jury Question, and Procedural Discretion,* 64 N.C.L.Rev. 993 (1986). Appellants should have the opportunity to introduce evidence to support their

challenge to the nepotism rule. Appellants' third point of error is sustained.

*Collier*, 764 *S.W.2d* at 366 (citations omitted).

Likewise, in this case, a factual issue was raised by the State's contention that its conflict of interest rule was necessary in order to retain public confidence in its real estate appraisers. Before the District Court or this Court could decide whether that need constituted a compelling state interest, someone first had to decide whether the allegation was true. Under our statutory system for resolving factual issues, that responsibility belonged to the jury. Therefore, I would conclude that the District Court did not err when it submitted that issue to the jury based on the proper instructions.

I otherwise agree with the majority opinion, including its conclusion that if the District Court did err by submitting issues regarding a compelling state interest to the jury, the error was harmless.

_____
Ju  ice

Justice William E. Hunt, Sr., joins in the foregoing concurring opinion.

_____
Justice

33

Justice Charles E. Erdmann specially concurring.

I join in the majority's opinion on Issues 1, 3, 4, and 5. I write separately in order to state that my concurrence on Issue 2 is limited to the final result as I cannot agree with the Court's reasoning and analysis with respect to the nature of the right at issue in this case.

The State failed to present evidence that Wadsworth's activities as a private real estate appraiser had in fact harmed the DOR or undermined the public's confidence in the tax appraisal system. I would therefore affirm the District Court's determination that Wadsworth's discharge was wrongful based on the fact that the State failed to provide any evidence to support its conflict of interest allegation. The State's speculation that a conflict of interest existed was not sufficient reason to terminate Wadsworth's employment and the jury's verdict was proper.

With that said, however, I do not agree with the majority's conclusion that Wadsworth has a fundamental right to pursue a particular job. The majority finds a fundamental right in the right to pursue employment in order to pursue life's basic necessities. The majority, however, fails to construe the meaning of "life's basic necessities." In fact, there was no discussion in the majority opinion as to whether Wadsworth's second job was needed in order for him to obtain these basic necessities. Life's basic necessities cannot and should not be an infinite term. One person's necessity can be another person's luxury. The right to

34

pursue employment is fundamental to the extent that employment provides those necessities.

In the majority's opinion, Wadsworth has successfully evaded his responsibility of limiting his right to the basic necessities. In fact, Wadsworth failed to produce any evidence as to the basic necessities of which he was deprived. A more plausible right encompassing Wadsworth's right to pursue employment would therefore be his right to acquire property. The right to acquire, possess, and protect property is also an inalienable right. Mont. Const. art. II, § 3. However, the right to pursue a particular job in order to acquire property is not fundamental.

The majority distinguishes the right to pursue employment generally as a necessary incident of the fundamental right to pursue life's basic necessities from a right or property interest in any particular job or employment. Absent a specified term of employment, this Court has held that an employee does not have a property interest in a particular job. Boreen v. Christensen (1994), 267 Mont. 405, 420, 884 P.2d 761, 770. Nor should a right to acquire property impart a fundamental right to pursue employment in a particular job. In this respect, I see no significant difference in the right to hold a particular job and the right to pursue a particular job.

In Cecil v. Allied Stores (1973), 162 Mont. 491, 513 P.2d 704, nonretail sellers claimed a legislative act that denied them the right to charge the same finance charges as retail sellers was a violation of their constitutionally protected right to acquire

35

property. **Similar to** the present case, the plaintiffs in Cecil argued that the act inhibited their ability to make money so that they may acquire property. This Court held that so long as the legislative classifications of the act are constitutional, it does not violate the right to acquire property. Cecil, 513 P.2d at 710.

As for the right to pursue a particular job, this Court has held that the practice of certain professions is not a fundamental right. Petition of Morris (1978), 175 Mont. 456, 458, 575 P.2d 37, 38. In Morris, the petitioner claimed that unification of the bar deprived him of his inalienable right to earn a living. Morris, 575 P.2d at 38. The Court held "[a]n individual has no inalienable right to earn a living practicing law. It is neither a vested right nor a property right. The practice of law is a privilege burdened with conditions." Morris, 575 P.2d at 38 (citation omitted). The practice of real estate appraising is similar to the practice of law in that both provide a needed service that is regulated by a professional board and is subject to certain educational and ethical standards. See Rule 8.57.413, ARM; Application of Montana Bar Ass'n Pres. (1974), 163 Mont. 523, 525, 518 P.2d 32, 33.

Finally, the inalienable rights set forth in our constitution's declaration of rights impart corresponding responsibilities. Mont. Const. art. II, § 3. Delegates to the 1971-72 Constitutional Convention expressed concern that people were accepting rights without recognizing that they create obligations. The convention committee concluded that the inclusion of such a statement would

committee concluded that the inclusion of such a statement would not infringe or impair the rights granted in the Declaration of Rights but would only accord a tone of responsibility to their exercise. Mont. Const. Conv. (1971-72) vol V, 1637. In this case, the majority has failed to acknowledge **any** corresponding responsibility on the part of Wadsworth in exercising his rights.

I would have found that Wadsworth did not have a fundamental right in pursuing a second job as a real estate appraiser. Therefore, the analysis of Wadsworth's pursuit of that particular employment should not be subject to strict scrutiny but scrutiny of a lesser degree.

_____
Justice